IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| LYNNE PEAL, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | No. 3:10-CV-0176-BF |
| § | |
| COMMISSIONER OF SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. Lynne Peal ("Plaintiff") brings this action pursuant to section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g). She seeks review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for Title II and Title XVI benefits under 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).

## I. BACKGROUND

*A. Procedural History*

On December 20, 2007, Plaintiff filed applications for Title II and Title XVI benefits, alleging a disability onset date of May 2, 2004. (Tr. 148-52.) Plaintiff alleged disability due to bipolar disorder and other mental and emotional problems. (Tr. 171.) The claims were denied initially and upon reconsideration. (Tr. 90-95; 98-101.) Plaintiff timely requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on December 16, 2008 in Dallas, Texas. (Tr. 12; 114.) On February 19, 2009, the ALJ issued an unfavorable decision, finding Plaintiff had not been under a disability from her date of onset through the date of the decision. (Tr. 9-19.) Plaintiff requested and was denied review of the ALJ's decision by the Appeals Council. (Tr.

1-5; 7.) Plaintiff filed this case on January 29, 2010, seeking judicial review of the administrative proceedings. (Doc. 1.) This matter is ripe for consideration on the merits.

*B. Factual History*

1. Plaintiff's Age, Education, and Work Experience

Plaintiff was born March 26, 1955. (Tr. 17; 148.) Plaintiff has a high school education. (Tr. 17.) She has past relevant work as a computer buyer. (Tr. 17.) Plaintiff met the insured status requirement of the Act through December 31, 2009. (Tr. 14.)

2. Plaintiff's Relevant Medical Evidence

Plaintiff began treatment with ABC Behavioral Health ("ABC") on February 16, 2007. (Tr. 266-68.) Plaintiff reported a history of Attention Deficit Disorder ("ADD"). (Tr. 266.) She complained of daily depression, crying spells, sleeping as often as possible, increased anger, lashing out at others, not getting things done, memory problems, and racing thoughts. (*Id.*) Plaintiff further noted a history of anxiety attacks dating back to 1983, when she was involved in a motor vehicle accident. (*Id.*) Her medical history was positive for multiple head injuries as a child and another head injury in 2001, when she slammed into a corner wall. (Tr. 267.) The mental status examination revealed: her appearance was disheveled; her speech was pressured; she was alert and oriented times three; her memory was average; her mood was irritable and inappropriate; her thought content showed grandiosity and paranoia; her insight was poor; and her judgment was poor. (Tr. 268.) The axis I diagnoses were bipolar II disorder and ADD, and the axis II diagnoses included personality disorder and narcissistic traits. (Tr. 269.) The axis V diagnosis was a current Global Assessment of Functioning ("GAF") of 40 with the highest GAF within the past year of 40 (40/40). (*Id.*)

Plaintiff returned to ABC on April 26, 2007 and reported she was doing fairly well but was

still depressed. (Tr. 263.) The axis I diagnoses were bipolar II disorder and ADD. (Tr. 262.) The axis V diagnoses were 40/40. (Id.) Her Celexa was increased. (Tr. 263.) When the Plaintiff returned on April 30, 2007, she noted that the Strattera only worked in the morning. (Tr. 261.) Her axis I diagnoses were unchanged, but her GAF was assessed at 50. (Tr. 260.) On June 26, 2007, Plaintiff complained of no motivation and reported sleeping during the day. (Tr. 259.) The examination showed: her appearance was disheveled; her motor activity was agitated her speech was pressured; her attention/concentration was intact; she was alert and oriented times three; her memory was intact; her mood was depressed; her affect was congruent; her thought processes were circumstantial; she had no suicidal or homicidal ideation; her insight was poor; and her judgment was poor. (Tr. 258.) The diagnoses were bipolar II disorder and ADD. (Id.)

On September 24, 2007, Plaintiff returned to ABC, and her axis I diagnoses remained the same, and her GAF scores were 40/40. (Tr. 256.) On December 10, 2007, she reported she was depressed and irritable. She also reported having verbal arguments but no physical altercations. (Id.) The diagnoses were bipolar II disorder and ADD. (Tr. 254.) Her current GAF was assessed at 35. (Id.)

On January 21, 2008, Plaintiff reported a decrease in short term memory. (Tr. 253.) She said she had been in no physical fights but had some depression. (Id.) The examination noted: her appearance was well groomed; her attitude was friendly; her motor activity was retarded; her speech was normal; her attention/concentration were intact; she was alert and oriented times three; her recent memory was decreased; her mood was depressed and irritable; her affect was congruent; her thought processes were well organized; she had no suicidal or homicidal ideation; her insight was poor; and her judgment was poor. (Tr. 252.) The axis I diagnoses were bipolar II disorder and ADD,

3

and the axis V diagnosis was a current GAF of 35. (Id.)

On February 18, 2008, Plaintiff reported her depression was ongoing. (Tr. 251.) The axis I diagnoses were unchanged and the axis V GAF was 40/40. (Tr. 250. On March 17, 2008, Plaintiff complained of having nightmares, seeing vivid visions and having some fear of not being able to breathe. (Tr. 249.) She also reported an increase in anxiety. (Id.) The examination noted her motor activity was agitate, her moot was depressed and irritable, and her thought content revealed paranoia. (Tr. 248.) Her axis I and axis V diagnoses were unchanged. (Id.)

Dr. Gerald Stephenson, Ph.D. performed a psychological consultative examination on March 20, 2008. (Tr. .) Plaintiff reported her problems as not wanting to do anything or go anywhere, no wanting to get up, not wanting to drive, and preferring her cats to people. (Tr. 237.) She said her problems began in 1993, and she stopped working in April 2005 because she could not function or stay focused anymore. (Id.) She told Dr. Stephenson that she began treatment for Attention Deficit Hyperactivity Disorder ("ADHD") symptoms in the mid-1990s and had a head injury in 2001. (Tr. 238.) She complained of poor concentration and memory, paranoid thoughts, morbid thoughts, withdrawal, depressed mood, anhedonia, and irritability. (Tr. 237.) The mental status examination revealed her mood was dysphoric, she had perceptual abnormalities of frequent visions of impending danger and doom, and her memory was limited in that she only recalled two of three words after a three minute delay. (Tr. 240.) Dr. Stephenson's axis I diagnosis was bipolar disorder, most recently depressed mood, and his axis II diagnosis was probably borderline personality disorder. (Tr. 241.) His axis V diagnosis was a GAF of 50-55. (Id.)

Plaintiff returned to ABC on April 14, 2008 and stated she was afraid she was going to die, occasionally saw visions during the day, and dreamed of suffocating. (Tr. 301.) She noted she was

4

afraid to leave the house. (Id.) The examination notes that Plaintiff's motor activity was agitated, her speech was pressured, her mood was anxious, her thought processes were circumstantial, her thought content revealed hallucinations, her insight was fair, and her judgment was fair. (Tr. 300.) The axis I diagnoses were bipolar II and ADD, and the axis V diagnosis was 40. (Id.)

On May 5, 2008, Plaintiff stated she had a decrease in her fears of dying but continued to have visual hallucinations of cats dying. (Tr. 299.) Her appearance was disheveled and her motor activity was agitated. (Tr. 298.) The examination noted that her mood was depressed and anxious, her thought processes were circumstantial, and her thought content displayed visual hallucinations. (Id.) The axis I and axis V diagnoses were unchanged. (Id.) Plaintiff reported feeling better on June 2, 2008 but stated she was still having morbid dreams. (Tr. 297.) The axis I diagnoses were unchanged, but her GAF was assessed at 50. (Tr. 296.) Plaintiff was seen at ABC on June 30, July 28, August 25, and October 20, 2008. (Tr. 293-294; 327-334.) Her axis I diagnoses remained the same, and her GAF ranged from 45-50. (Tr. 293-294; 327-334.)

On December 3, 2008, Dr. Elizabeth Adams, of ABC, completed a Mental Impairment Questionnaire. She opined that Plaintiff would have poor or no ability to: remember work-like procedures; carry out very short and simple instructions; maintain attention for two hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly

5

distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; set realistic goals or plans independently of others; interact appropriately with the general public; travel in unfamiliar places; and use public transportation. (Tr. 339-41.) Dr. Adams further noted that Plaintiff is markedly limited in activities of daily living, extremely limited in maintaining social functioning, and has constant deficiencies of concentration, persistence, and pace. (Tr. 341.) Finally, she opined that Plaintiff would likely be absent from work more than three times a month. (Tr. 338.)

### 3. Plaintiff's Hearing

At the hearing on December 16, 2008, Plaintiff appeared with counsel and testified that she did not believe she could return to work on a regular basis. (Tr. 30.) She has problems with staying focused, depression, and being around people (Tr. 30.) She is not able to communicate properly with people. (Id.) She first saw a psychiatrist in 1991 or 1992 due to various personal issues relating to divorce and the loss of her job. (Tr. 32-34.) She stopped seeing the mental health professional after six to eight months because she thought she no longer needed help. (Tr. 33-34.) She has been seeing Dr. Sheehan since 2007 and has been prescribed Wellbutrin, Klonopin, Tegretol, and Clonazepan. (Tr. 30-32.)

She testified that after losing her job in the early 2000s, she started her own company in the same line of work. (Tr. ?; 35.) However, the "industry was gone," and she had to close the business in 2004. (Tr. 35.) She has not been able tow ork since that tie because of her depression and inability to focus. (Tr. .36-37.) She cannot concentrate for long periods of time, and she has nightmares and morbid thoughts. (Tr. 37.) She lives with her mother, and her mother supports her. (Tr. 36.) She sleeps often and does not do anything during the day. (Tr. 37.)

Plaintiff testified that she once had a substance abuse problem with methamphetamine that lasted about two months. (Tr. 39.) She has been arrested twice before. (Tr. 40-41; 44.) She has not taken non-prescription drugs for one and a half to two years. (Tr. 44.) She testified that she has not failed a drug test since she started taking them. (Tr.44.) She had mental problems before and after the drug abuse. (Tr. 49.)

The medical expert ("ME") testified that Plaintiff has a history of amphetamine abuse and that Plaintiff tested positive for amphetamines at ABC on February 16, 2007. (Tr. 45.) Plaintiff was previously prescribed Dextroamphetamine for ADHD, but that was more than ten years ago. (Tr. 46.)

The ME stated that Plaintiff has the severe impairments of "bipolar II disorder, personality disorder, narcissistic, borderline, as well as a history . . of substance abuse, borderline." (Tr. 46.) He stated that she experiences sleep disturbance, decreased energy, concentration difficulties, hallucination, paranoid thoughts, easy distractability, mood disturbance, and impulsive behavior.. (Tr. 50-52.) Without drugs, Plaintiff has moderate limitations in daily living, social function, and persistence and pace and has no episodes of decompensation. (Tr. 52.) When Plaintiff is using drugs, she has marked restrictions in daily living, social functioning, and persistence and pace and has no episodes of decompensation. (Tr. 53.) He noted that although the consultative examiner had noted episodes of decompensation, it could be interpreted in a lot of ways. (Tr. 67-68.) The ME stated that he generally agreed with the mental residual functional capacity ("RFC") assessment performed by medical consultant, Dr. Robert White. (Tr. 53.) However, he would change her ability to interact appropriately with the general public from "non-significant" to "moderate." (Tr. 54.) He testified that it did not appear that Plaintiff had actively abused methamphetamine since the onset date. (Tr.

7

54.) He also testified that he did not believe Plaintiff's GAF scores were inconsistent with the RFC assessment. (Tr. 76-77.)

The vocational expert ("VE") testified that, based on the RFC assessed by Dr. White modified only by moderate limitations in ability to interact with the general public, Plaintiff cannot preform her past relevant work. (Tr. 55.) She cannot perform any work above SVP three and is limited to superficial, incidental public contact. (Tr. 55.) She has no transferable skills. (Tr. 56.) If limited to medium, unskilled work with only incidental public contact, Plaintiff could still perform 203,000 jobs available in Texas and 2,700,000 jobs available in the United States. (Tr. 56-57.) Examples given by the VE included kitchen helper (medium, unskilled, SVP of 2), warehouse worker (medium, unskilled, SVP of 2), and packager (medium, unskilled, SVP of 2). The VE noted that abilities to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods are particularly important in unskilled work. (Tr. 59.) Finally, the VE testified that an individual with no exertional limitation but who is limited to incidental contact with the public and co-workers and has problems with attention an concentration and an inability to respond appropriately to changes in a routine work setting and criticism could not find competitive employment. (Tr. 77-78.)

### *C. The ALJ's Findings*

First, the ALJ found that Plaintiff last met the insured status requirements of the Act through December 31, 2009. (Tr. 14.) Second, the ALJ found that Plaintiff has not engaged in substantial gainful activity since February 16, 2007, the alleged onset date. (Tr. 14.) Third, he found Plaintiff to have the severe impairments of bipolar disorder, personality disorder, and substance abuse, in

8

remission. (Tr. 15.) Fourth, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix I of the Regulations. (Tr. 15.) Fifth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform medium work except that the work must be unskilled with limited public contact. (Tr. 16.) In making this determination, the ALJ found the testimony of Plaintiff regarding the intensity, persistence, and limiting effects of Plaintiff's symptoms not credible. (Tr. 16.) Sixth, the ALJ found that Plaintiff is unable to preform any past relevant work. (Tr. 17.) Seventh, he determined that Plaintiff was an individual closely approaching advanced age on the alleged onset date. (Tr. 17.) Eighth, he found that Plaintiff has at least a high school education and is able to communicate in English. (Tr. 17.) Ninth, the ALJ found that transferability of job skills was not material to the determination of disability. (Tr. 18.) Tenth, he determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 18.) Finally, he found that Plaintiff was not under disability, as defined by the Act, from February 16, 2007 through the date of the decision. (Tr. 18.)

## II. ANALYSIS

### A. Standard of Review

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. Leggett, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. Id.

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute

its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

### *B. Issues for Review*

Plaintiff argues that the ALJ erred by (1) failing to find Plaintiff's ADD/ADHD a severe impairment and (2) failing to consider all medical opinions in the record. Defendant counters that (1) substantial evidence supports the ALJ's step two decision and (2) the ALJ properly considered an evaluated the medical source opinions.

### *C. Step Two Determination*

The ALJ determined that Plaintiff has that following severe impairments: bipolar disorder, personality disorder, and substance abuse, in remission. (Tr. 15.) Plaintiff contends that her ADD/ADHD should have been found to be a severe impairment, and that the omission indicates the ALJ failed to consider how ADD/ADHD impacted her RFC.

In the Fifth Circuit, "an impairment can be considered non-severe only if it is a slight abnormality having such minimal effect that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, at 1102 (5th Cir. 1985). Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration. *Stone*, 752 F.2d at 1106. In addition, once it is determined that an individual has a sever impairment at step two, the combined effect of all impairments, even those not severe, are considered in determining the RFC. 20 C.F.R. 404.1545(e), 416.945(e).

Here, the ALJ cited to *Stone* in his opinion, and there is no indication that he failed to apply it to the facts of Plaintiff's case. To support her argument that ADD/ADHD is severe, Plaintiff

11

references various times when she was diagnosed with ADD/ADHD. However, the diagnosis of an impairment does not establish a disabling impairment or even a significant impact on that person's functional capacity. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (noting that the mere presence of some impairment is not disabling per se). Furthermore, the ALJ noted that Plaintiff's medical records from ABC show that Plaintiff experiences agitation, depression and irritability absent medication, indicating that, with medication, Plaintiff's symptoms were controlled. *See Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990). Even though Plaintiff testified to taking medication for ADD for more than eight years, she was gainfully employed during this time. Beyond her own testimony, which the ALJ found to be not credible, Plaintiff has provided no evidence to show any limiting effects from ADD/ADHD. Substantial evidence supports the ALJ's step two decision.

Moreover, it is clear that the ALJ did consider Plaintiff's ADD/ADHD, a not severe impairment, in determining Plaintiff's RFC. Not only does the ALJ specifically address her diagnoses at ABC in 2007 and 2008, he also references her reports of problems with concentration. As noted above, the ALJ indicated that with medication, Plaintiff's symptoms are controllable. Plaintiff's argument that the ALJ did not consider her ADD/ADHD in his opinion is without merit. The Court finds that the ALJ determined Plaintiff's RFC after properly considering the evidence of ADD/ADHD, concluding it had no effect on her RFC.

### D. Mental Impairment Questionnaire

Plaintiff argues that the ALJ erred by failing to consider all the medical opinions in the record. The opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight in determining disability. A treating

12

physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). On the other hand, "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). Treating source opinions on issues that are reserved to the Commissioner, such as an individual's RFC, are never entitled to controlling weight or special significance. SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).

First, the Plaintiff contends the ALJ erred by failing to give weight to the GAF scores assigned by her treating and consultative physicians. The Court notes that "while a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Perez v. Astrue*, No. 6:07-CV-014-BI, 2008 WL 4108130, at *8 (N.D. Tex. Sept. 5, 2008) (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). The Commissioner has specifically declined to endorse the GAF scale for use in the disability programs and has stated that it "does not have a direct correlation to the severity requirements in our mental disorders listings." REVISED MEDICAL CRITERIA FOR EVALUATING MENTAL DISORDERS AND TRAUMATIC BRAIN INJURY, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000); *see also Cromwell v. Astrue*, No. 4:10-CV-061-Y, 2011 WL 666282, at *7 (N.D. Tex. Jan. 21, 2011). Therefore, the Plaintiffs argument that the ALJ committed legal error by failing to assign weight to the GAF scores is without merit.

Furthermore, it is clear from the decision that the ALJ did in fact consider the GAF scores

13

and assigned them little weight, stating that "the text is more important than the GAF scores." This decision is supported by substantial evidence. Although Plaintiff was assigned GAF scores ranging from 35 to 55, the treatment notes that correspond to those scores report that Plaintiff was well-groomed, friendly, relaxed, alert, and oriented and had intact attention/concentration, intact memory, well-organized thought process, fair insight, and fair judgment. (Tr. 294; 296; 302; 304.) Other reports indicate Plaintiff experienced no symptoms beyond mild depression. (Tr. 315; 317.) Furthermore, the ME testified that a GAF score is "only part of the axis" and is "not the whole picture of . . . the clinical interview." (Tr. 70-71.) Finally, as noted above, the Commissioner has declined to endorse the GAF scale for use in the disability programs. Substantial evidence supports the ALJ's decision to give little weight to Plaintiff's GAF scores.

Plaintiff next argues that the ALJ erred by failing to consider a Mental Impairment Questionnaire, dated December 31, 2008, submitted by Dr. Adams to the ALJ after the hearing. Defendant contends that the ALJ properly considered all evidence contained in the record because the decision states that he "considered opinion evidence in accordance with the requirements" of the Social Security Regulations and Rulings. (Tr. 16.) Defendant correctly notes that "the ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it." *See Hammond v. Barnhart*, 124 F.App'x 847, 851 (5th Cir. 2005) (noting that the ALJ's decision states explicitly that he considered the entire record in his decision). However, in this case, the ALJ's analysis indicates that the ALJ did not in fact consider the questionnaire. The ALJ states that he accepts the nonexamining physician's opinion because is not inconsistent with the treating source opinions. However, that opinion is inconsistent with Dr. Adams' questionnaire. Therefore, the Court can come to no other conclusion than the ALJ failed to consider the questionnaire when making his

14

RFC determination and, therefore, violated the Regulations. See 20 C.F.R. § 404.1527(d) ("regardless of it's source, we will evaluate every medical opinion we receive").

Defendant, citing to Social Security Ruling 96-5p, also argues that the questionnaire is not entitled to any special significance, as it concerns Plaintiff's RFC, an issue reserved for the Commissioner. However, Defendant is mistaken. SSR 96-5p does reserve some issues, such as the RFC determination, to the ALJ. *See* SSR 96-5p, 1996 WL 374183, at *2. However, it also clarifies the difference between a "medical source statement" and an "RFC assessment." *See id.* at *4-5. A medical source statement is a "medical opinion . . . about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." *Id.* at *4. These statements are opinions based on the medical sources' personal knowledge of the individual. *Id.* An RFC assessment, on the other hand, "describes an adjudicator's finding about the ability of an individual to perform work-related activities" and is based on all relevant evidence in the case record. *Id.* at *5. The Ruling states that medical source statements submitted by treating sources are opinions entitled to special significance and may be entitled to controlling weight. *Id.* Furthermore, adjudicators must weigh medical source statements and provide appropriate explanations for accepting or rejecting such opinions. *Id.*

The Mental Impairment Questionnaire was submitted by Plaintiff's treating physician and is based on Dr. Adams' records and examination of Plaintiff. Therefore, the Court finds that the Questionnaire is a medical source statement under SSR 96-5p and is entitled to special significance. Furthermore, the Court finds that the ALJ should have explained the weight he gave to the opinion

15

and that failure to do so was error.[1]

Finally, Defendant contends that even if error occurred, such error was harmless. Defendant asserts that if the ALJ had discussed Dr. Adams' opinion, he would have not given it great weight. The Court is unable to say what the ALJ would have done. Contrary to Defendant's assertion, the questionnaire is neither unsupported by the medical findings nor inconsistent with the evidence in the record as a whole. There are some records that reflect depression, hallucinations, paranoia, agitation, irritability, disheveled appearance, poor insight, and poor judgment. (Tr. 248; 250; 252; 254; 256; 258; 268.) Based on review of the record, it is possible that the ALJ would have assigned greater weight to the opinion if he had evaluated it according to the rules set out in 20 C.F.R.§§ 404.1527 and 416.927. Therefore, a different RFC might have resulted. Failure to consider the questionnaire and explain the weight given was prejudicial error. Therefore, the Court finds that the case should be reversed and remanded for reconsideration in line with this opinion.

## **CONCLUSION**

Because the ALJ failed to properly consider all evidence when determining Plaintiff's RFC, this case is REVERSED and REMANDED for reconsideration.

SO ORDERED, March 17, 2011.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

---

[1] The Court also notes that even if Dr. Adams' opinion concerned an issue reserved to the Commissioner, the Commissioner is still required to evaluate the evidence and determine the extent to which the opinion is supported by the record. See SSR 96-5p, 1996 WL 374183, at *3 ("opinions from any medical source on issues reserved to the Commissioner must never be ignored").